**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HARTMAN, et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No. 4:19-cv-02963 SRC |
| | ) | |
| BEARY BOWLES, | ) | |
| | ) | |
| Defendant(s). | ) | |

**MEMORANDUM AND ORDER**

## I.      BACKGROUND

The police charged Plaintiffs, brothers James[1] and Ryan Hartman, with the early-morning

shooting of a prominent fire-captain and his companion.  Defendant Beary Bowles, a detective,

investigated the shooting, but as was later learned, exonerating evidence cleared the Hartmans.

The prosecution eventually dropped the charges, and the Hartmans now seek redress from

Bowles, alleging he violated the U.S. Constitution and other laws when he failed to properly

investigate, and maliciously continued to prosecute, the crime.  Bowles moves to dismiss [13] on

various grounds.  Portions of the motion have merit; the Court grants those portions, and denies

the remainder.

## II.      STANDARD

Under Federal Rule of Civil Procedure ("FRCP") 12(b)(6), a party may move to dismiss

a claim for "failure to state a claim upon which relief can be granted." The notice pleading

standard of FRCP 8(a)(2) requires a plaintiff to give "a short and plain statement showing that

---

[1] Throughout this order, the Court refers to Plaintiffs by their first names to differentiate between the two, not to imply any familiarity.

the pleader is entitled to relief." To meet this standard and to survive a FRCP 12(b)(6) motion to dismiss, "a complaint must contain sufficient factual matter, accepted as true, to state a claim to relief that is plausible on its face." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009) (internal quotations and citation omitted).  This requirement of facial plausibility means the factual content of the plaintiff's allegations must "allow[] the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Park Irmat Drug Corp. v. Express Scripts Holding Co.*, 911 F.3d 505, 512 (8th Cir. 2018) (quoting *Iqbal*, 556 U.S. at 678).  The Court must grant all reasonable inferences in favor of the nonmoving party. *Lustgraaf v. Behrens*, 619 F.3d 867, 872-73 (8th Cir. 2010).  Ordinarily, only the facts alleged in the complaint are considered for purposes of a motion to dismiss; however, materials attached to the complaint may also be considered in construing its sufficiency. *Reynolds v. Dormire*, 636 F.3d 976, 979 (8th Cir. 2011).

When ruling on a motion to dismiss, a court "must liberally construe a complaint in favor of the plaintiff[.]" *Huggins v. FedEx Ground Package Sys., Inc.*, 592 F.3d 853, 862 (8th Cir. 2010).  However, if a claim fails to allege one of the elements necessary to recover on a legal theory, the Court must dismiss that claim for failure to state a claim upon which relief can be granted. *Crest Constr. II, Inc. v. Doe*, 660 F.3d 346, 355 (8th Cir. 2011).  Threadbare recitals of a cause of action, supported by mere conclusory statements, do not suffice. *Iqbal*, 556 U.S. at 678; *Bell Atlantic v. Twombly*, 550 U.S. 544, 555 (2007).  Although courts must accept all factual allegations as true, they are not bound to take as true a legal conclusion couched as a factual allegation. *Twombly*, 550 U.S. at 555 (internal quotations and citation omitted); *Iqbal*, 556 U.S. at 677-78.

III.    **FACTS**

For purposes of these Motions to Dismiss, the Court accepts as true the following facts alleged in the Hartmans' Amended Complaint. *Great Rivers Habitat Alliance v. Fed. Emergency Mgmt. Agency*, 615 F.3d 958, 988 (8th Cir. 2010).  On the evening of February 7, 2017, Super Bowl Sunday, James and Ryan, brothers, went out for the evening.  As shown on surveillance video, at approximately 12:23 a.m. on February 8, 2017,[2] James's car, a slate gray Infiniti sedan, entered the Phillips 66 gas station located at the southeast corner of the intersection of South Seventh Street and Russell.  James went into the convenience store and purchased cigarettes.  A few minutes later, James came out, got back in his car.  In the video, James appears relaxed and "is in every way acting like a normal citizen going about his life."  These facts have been known to Bowles, a detective with the St. Louis Metropolitan Police Department, at all relevant times.

The City maintains an outdoor camera system which generates "real crime time" records and its police dispatch system which generates time records; both are reliable indicators of exact time.  Bowles had the real crime time records and the dispatch time records related to this case at all relevant times.

As shown on the real crime time records, at 12:30:17 a.m., James's car exited the gas station onto eastbound Russell and then made a right turn onto southbound Seventh Street.  A few minutes before James left the gas station, a St. Louis City fire captain stopped his car on the right shoulder of southbound Seventh Street in the 2500 block, between Sidney Street and Victor, approximately 180 feet south of Victor.  This is approximately .4 miles, or six blocks, south of the gas station.  There are no stop lights between the gas station and the spot where the

---

[2] The Amended Complaint states on February 6, 2017.  The Court assumes this is a typographical error.  The remainder of the Amended Complaint makes clear that the events occurred on February 8, 2017.

fire captain stopped his car.  The fire captain had a female passenger in the front passenger seat of the car.

At exactly 12:32:45, a citizen living in the area called 911 to report shots fired.  "If one assumes a minimum of 5 seconds for a witness to hear shots, process the information in his mind, and then call 911, then the latest time the shots could have been fired was 12:32:40."  The difference between the time the Hartmans left the gas station, 12:30:17, and the latest possible time the shots could have been fired, 12:32:40, is two minutes and 23 seconds, or 143 seconds.  At 12:34:46, the fire captain called 911 and reported that someone had shot him and his passenger.  During the 911 call, the fire captain described the shooter as "black male, hoodie."

The morning after the shooting, Bowles's supervisor assigned him as the lead investigator of the shooting.  Bowles responded to the scene at approximately 8:00 a.m. and began canvassing the area for businesses that may have surveillance videos.  Bowles obtained, and observed, at least four surveillance videos from Production Steel, located at the time at the northwest corner of Seventh Street and Victor, in the block immediately north of the shooting.  The time stamp records on these videos indicate the events start at 00:10:15, that is 10 minutes, 15 seconds after midnight.  "Based on the various more accurate times of various clocks, it is a reasonable assumption that the Production Steel camera timer had 'drifted' behind by approximately 10 minutes from real time, and therefore the Production Steel video is useful only for the purpose of determining the amount of time elapsing during the events portrayed, and not for the purpose of determining the accurate time of events."  Bowles has no documentation of any effort to determine the exact amount of drift in the Production Steel camera system.

The surveillance videos from Production Steel showed a vehicle appeared on Ninth Street, just north of Victor, with its headlights on with a time stamp of 00:10:15.  The vehicle

travels a short distance northbound.  At 00:10:23, it turns right, eastbound, onto Victor.  It turns

out its headlights and drives eastbound for ten seconds.  At 00:10:34, the vehicle slowly comes to

a stop, just before Seventh Street.  A person exits the passenger side of the vehicle at 00:10:38

and walks back and forth on the sidewalk, near the car, for 18 seconds.  The person walks out of

sight southbound on Seventh Street.  After 1 minute and 34 seconds, the person reappears

running northbound on Seventh Street.  The person turns to his left onto the southern sidewalk of

Victor, quickly moving westbound towards the vehicle.  At 00:12:34, he gets back in the

passenger side of the vehicle.

Nine seconds later, the car travels in reverse on westbound Victor to Ninth Street at a

high rate of speed, with its headlights off.  At Ninth Street, the vehicle makes a "T-turn"

backwards onto Ninth Street and begins moving forward whereupon it travels northbound on

Ninth Street until it is out of sight at 00:12:52.  This vehicle appears on a different camera, a few

yards north of the prior camera, traveling northbound on Ninth Street at a high rate of speed with

its headlights off.  The vehicle turns westbound on Barton, one block north of Victor, turns on its

headlights, and goes out of view at 00:13:03.

Bowles also obtained surveillance video from Anheuser-Busch, located a few blocks

south of Sidney Street.  Bowles testified in his deposition that the Anheuser-Busch video shows a

car traveled southbound on Seventh Street between Victor and Sidney, it paused for a few

seconds, and then turned right on westbound Sidney.  In his police report, Bowles wrote that

when he watched the video, "I observed what appeared to be headlights of the vehicle just

outside of camera view north of the intersection and paused in the street."  He also wrote that he

"saw the car stop at the same location where the victims were shot," and then it turned right, a

couple of minutes before the shooting.  The Anheuser-Busch videos show nothing meaningful

about the movement of that car."  At all relevant times, Bowles believed the person in the vehicle in the Production Steel videos and the vehicle in the Anheuser-Busch video was the true shooter.

At some unknown time, a citizen residing on Ninth Street between Victor and Barton called 911 to report that he heard gun shots and saw a car engaged in suspicious activity.  The prosecution never produced the tape of this call during the Hartmans' criminal case.  In his police report, Bowles stated the 911 caller described the car as a "newer blue, model Chrysler 200 or blue compact vehicle."  Bowles also stated that Detective Nicholas Shelton thought the vehicle in the Anheuser-Busch video "looked like a blue Chrysler 200."  At 12:46:15, the dispatch operator broadcast over the police radio network that the car was a "navy Chrysler 200."

In a later interview, according to Bowles, the 911 caller stated the car traveled rapidly north on south Ninth Street with no headlights on, turned its headlights on as it approached Barton, and turned left, or west, onto Barton.  Bowles stated in his deposition that the 911 caller said the car might be an Infiniti.  In his police report, Bowles wrote that the car was "possibly a Toyota or Infinity, both of which are made by the same manufacturer."  Infiniti is a luxury car division of Nissan, and Nissan is a different manufacturer than Toyota.

In response to the fire captain's 911 call, police and EMT personnel arrived at the scene, including Officers Eric Paul and Kevin Ryan.  Officer Paul wrote the initial police report and stated that at the scene, the fire captain described the shooter as a "black male wearing a black hoodie."  At 12:48:24, Officer Paul reported this description of the suspect over the police radio network.  At 12:49:26, dispatch broadcasted another description of the suspect as a "black male wearing a black hoodie running north with a gun." At the scene, the fire captain's passenger could not make a statement due to her medical condition.

6

In his deposition, the fire captain stated that after the shooting, he got out of his car and saw the shooter running northbound on Seventh Street.  The shooter tripped and fell to the ground and then immediately got back up and continued running north.  The fire captain stated the shooter wore baggy clothes, but he could not remember the shooter's race.  In later interviews with Bowles, he told Bowles he could not remember the shooter's race.  In his deposition, the fire captain also stated that Bowles only showed him photos of the Hartmans. The fire captain testified he did not give a description of the shooter to the grand jury.  Nothing in the record indicates that the fire captain said anything about baggy clothes while at the scene. Bowles wrote in his police report that, at the hospital, the fire captain stated the shooter wore "baggy clothes."

Officer Bradley Summers interviewed the fire captain at the hospital and later informed Officer Paul of the conversation.  According to Officer Paul's report, the fire captain told Officer Summers he first observed the black male wearing the black hoodie "walk south on the adjacent sidewalk passing his location.  A brief time later, he observed the same black male, suspect #1, standing near the front passenger's side display a handgun and fire several rounds into his vehicle.  He then observed suspect #1 run north in the 2500 block of [Seventh] Street on the sidewalk until out of sight."

The Hartmans are Caucasians and "they have skin color commonly which is referred to as 'white.'"  The gas station surveillance video from the night in question, along with a separate gas station video taken two hours later, show neither Ryan nor James was wearing a black hoodie or baggy clothes.  Bowles never spoke to Officer Paul before his deposition in this case, which took place 18 months after the shooting.  On inference, Bowles never spoke to Officer Ryan, the other officer who first responded to the scene, either.  At his deposition, Bowles

testified that the fire captain was "not certain" about the skin color of the shooter during their conversation at the hospital the morning after the shooting.  He further testified that the fire captain believed the shooter was a black male only because he had on baggy pants, the "sort of clothing worn by black people," and because of his "body type."

Bowles did not put this conversation with the fire captain in his report.  The fire captain testified in his deposition that he did not recall what he told Bowles about the identity of the shooter.  Bowles testified in his deposition that his conversation with the fire captain in the hospital was tainted because the fire captain was sedated.  Before his deposition, Bowles never listened to the 911 call tapes.  Officer Summers testified in his deposition that Bowles had never spoken to him directly about his interview of the fire captain at the hospital.

Bowles testified in his deposition that a month after the shooting, he presented the fire captain with photo line-ups that only included the Hartmans and the fire captain did not recognize either one.  Later in his deposition, after being confronted with the fact that this violated department policy, Bowles testified he presented the fire captain with a complete photo line-up.

The Hartmans infer that Bowles felt pressure to identify a shooter because the fire captain was a prominent member of the community.  Bowles identified James as a possible suspect through gas station credit card records and car ownership records.  "Bowles decided to give up on finding the black male who really did commit the crime and instead elected to just charge some persons who conveniently happened to be at a nearby gas station at generally the same time and who were driving a close in color sedan.  Those persons were Plaintiffs."

According to the Complaint, the only way for Bowles's theory that either James or Ryan shot the fire captain to be correct is for a series of events to have occurred after they left the gas

8

station at 12:30:17 and before the shooting at 12:32:40, a span of 2 minutes and 23 seconds. Doc. 10-1, pgs. 14-15.  For the purposes of judicial economy, the Court refers to the Complaint for the list of events.  Based on the timing of the events that did occur, the Hartmans allege no reasonable officer would believe the Hartmans committed the crime because not enough time existed from the time they left the gas station to the time of the shooting for them to do so. Bowles never reviewed or developed a theory of any motive the Hartmans had to commit the crime, nor does he mention motive anywhere in his investigatory materials.

During Ryan's arrest, officers found a 9mm gun in his possession.  Ballistics evidence demonstrated that this gun was not the gun used to shoot the fire captain and his passenger. Bowles failed to investigate or consider the impact of this evidence.  In October 2017, nine months after the shooting, police responded to a shooting in north St. Louis and found shell casings.  Forensic analysis revealed the shell casings were from the same gun involved in this shooting.  Bowles knew that the same gun had been used in both incidents through NIBIN, a police internal notification network system.  Bowles failed to investigate or consider the impact of this evidence.  Despite knowledge of this evidence, Bowles did nothing to get the charges dropped or the Hartmans released.

At the beginning of March, Bowles signed a search warrant application and an affidavit in support to search James's then residence.  A judge signed both the application and search warrant.  In his affidavit Bowles wrote, "Victim described a male running north from the crime scene wearing baggy clothes and grey (sic) hoodie."  He did not include that the victim described the shooter as a black male.  He also wrote, "Witness Antonio Perry stated he observed a new model vehicle fleeing the area after hearing the shots fired.  The Infiniti was observed on surveillance camera footage in the area prior to the shooting."  Bowles further wrote, "Perry

positively identified the Infinity as the vehicle he had observed fleeing the area after to (sic) the

shooting." He did not include that in his original 911 call, Perry described the car as a Chrysler

200, nor did he include that Officer Shelton, after a review of surveillance video, described the

car as a Chrysler 200.

Bowles did not include in his affidavit any of the following information:  the victim

described the shooter as wearing a hoodie and surveillance videos show neither Hartman wore a

hoodie; there was not enough time for the Hartmans to have committed the crime;[3] and the true

shooter's gun was used in another crime while the Hartmans remained on house arrest.[4] On the

same day, Bowles also signed a search warrant application and affidavit in support to search

Ryan's then residence, his parents' home. This search warrant and application lacked the same

omissions. A judge signed the application and search warrant.

Shortly thereafter, Bowles and other officers conducted a SWAT raid to execute the

search warrant at James's residence. During the execution of the search warrant, the officers

found James in possession of controlled substances. As a result, James faced drug charges.

Bowles and other officers then conducted a SWAT raid at Ryan's residence, his parents' house,

to execute the search warrant. Officers found no incriminating evidence at this location.

One day later, in support of an information charging James with the shooting and for an

application for James's arrest, Bowles signed a probable cause statement against James. It stated

Bowles had "probable cause to believe that James [James] Hartman, a White Male, DOB;

---

[3] While the Court accepts as true that Bowles did not include this statement in his affidavit, the Court does not
accept as true that there was not enough time for the Hartmans to have committed a crime because it is a conclusion
not well-supported by the other facts alleged in the Complaint.
[4] While the Court accepts as true that Bowles did not include that the shooter's gun was used in another crime while
the Hartmans remained on house arrest in his application for the search warrant, the Court also notes that the
Complaint's other allegations, when accepted as true, establish Bowles could not have included this information in
the search warrant application because the second shooting involving the same gun did not occur until October
2017, seven months after Bowles applied for the search warrant.

5/231/93 Age, 23, committed one or more criminal offense(s): Count I: Assault 1st Degree or

Attempt[;] Count II: Armed Criminal Action[;] Count III: Assault 1st Degree or Attempt[;]

Count 4: Armed Criminal Action.  For facts supporting this belief, Bowles wrote:

> I was assigned as the lead Detective in the follow up investigation of a shooting
> that occurred on February 6, 2017, in the area of 2500 S. 7th Street here in the City
> of St. Louis.  During my investigation, I learned that the victims I.S. and L.S. were
> in a vehicle parked at 2500 S. 7th Street.  While the victims were in the vehicle, a
> blue Infinity approached the approximate location of the victims.  As the Infinity
> approached, the driver of the Infinity turned the lights off and continued to approach
> the approximate location of the victims' vehicle.  The passenger of the Infinity then
> exited the car, approached the victims' car and shot multiple times into the vehicle.
> I.S. was shot multiple times.  L.S. was also shot multiple times.  Both victims
> sustained serious injuries and were taken to the hospital for treatment.  Cellular
> phone records, bank records, and multiple surveillance videos were obtained that
> identify the defendant as the passenger and his brother, James Hartman, as the
> driver.

On this same date, in support of the filing of an information charging Ryan with the shooting and

for an application for Ryan's arrest, Bowles signed a probable cause statement against Ryan that

differs from James's only in the last few phrases which are insignificant.  These statements

omitted previously stated facts which allegedly exonerate the Hartmans and omitted Bowles's

failure to follow police procedure.

That same day, law enforcement arrested Ryan and James for first degree assault and

armed criminal action.  After their arrests, law enforcement subjected Ryan and James to

videotaped interrogations.  James and Ryan stated after they went to the gas station, they were

hoping a friend would call to continue the evening.  While they waited, they went southbound on

Seventh Street to Sidney, went westbound on Sidney for three blocks to Eleventh Street and

parked.  Ryan then urinated and both James and Ryan took cocaine.  The friend called and James

and Ryan drove to a nightclub, the Pepper Lounge at 2005 Locust Street, where they remained

for approximately two hours.  The Pepper Lounge's dress code, as stated on its website, did not

allow hoodies.  James and Ryan denied having anything to do with the shooting.

11

Judges set the bond for each Hartman at $750,000.00.  Neither James nor Ryan could make bond and remained in jail.  The Circuit Attorney presented the case to a grand jury and the grand jury indicted the Hartmans.  From March 3, 2017, until July 27, 2017, when the court reduced their bonds, the Hartmans were in the City of St. Louis Justice Center on Tucker Boulevard.  After they made bond, James and Ryan remained on house arrest at their parents' home until November 1, 2018, more than 15 months.

In July 2018, an initial trial date came up.  The Assistant Circuit Attorney assigned to the case entered *nolle prosequi* on the charges but immediately refiled the cases.  The Hartmans were again processed through the justice system's intake procedures and they remained on house arrest.

In approximately March 2019, close to the new trial date, Bowles enhanced a photo of the vehicle in the Production Steel video.  An examination of that enhanced photo determines conclusively that the car in the photo is not an Infiniti.  The Hartmans allege that Bowles could have enhanced the Production Steel video at the beginning of the case, before filing search warrant affidavits and probable cause statements.  If he had, it would have revealed the make of the car and the license plate number.  After the Circuit Attorney knew the car in the video did not belong to the Hartmans, the Circuit Attorney entered *nolle prosequi* on all charges and released the Hartmans.  They have not been subject to further charges.

## III.   DISCUSSION

The Hartmans assert five counts against Bowles: (1) Fourth Amendment – unlawful searches of James's apartment and the Hartmans' parents' house; (2) Fourth Amendment – initial seizure of the person without even arguable probable cause; (3) Fourth Amendment – unreasonable continued seizure after obtaining forensic information about gun; (4) Fourth

12

Amendment – unfair criminal proceedings; and (5) Missouri state law claim for malicious prosecution.  Bowles filed a motion to dismiss asserting the Hartmans' claims fail because Bowles had reason to believe his warrant applications established probable cause and he did establish probable cause, and because he is entitled to qualified immunity and official immunity.

In his Motion to Dismiss, Bowles asserts five arguments for why the Court should dismiss the Hartmans' claims:  (1) Count I fails because it was not entirely unreasonable for Bowles to believe the search warrant applications established probable cause, because they did establish probable cause; (2) Count II fails because Bowles had at least arguable probable cause to arrest the Hartmans; (3) Counts III and IV, for unreasonable continued seizure and unfair criminal proceedings, fail because Bowles had probable cause to arrest and restrain the Hartmans; (4) Bowles is entitled to qualified immunity because his conduct comported with and did not violate clearly established law; and (5) Count V, for malicious prosecution, fails to state a claim because the existence of probable cause negates the actions for malicious prosecution.

## A.    Count I – Unlawful Searches

In his first argument, Bowles asserts Count I fails to state a claim because Bowles had probable cause to search the Hartmans' residences.

Generally, "a warrant confers a 'shield of immunity' to officers acting within the scope of its authority."  *Kiesling v. Holladay*, 859 F.3d 529, 533 (8th Cir. 2017) (quoting *Messerschmidt v. Millender*, 565 U.S. 535, 546-48 (2012)).  "The fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner."  *Id*. The exception is when the warrant is "based on an affidavit so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Id*.  The question is not whether a warrant application was sufficient to establish probable cause of criminal activity.  *Id*.

at 534.  Instead, the Court must ask "whether it was entirely unreasonable for an officer to believe that the warrant application established probable cause."  *Kiesling v. Holladay*, 859 F.3d 529, 534 (8th Cir. 2017).  A search warrant may be invalid if "the issuing judge's probable cause determination was based on an affidavit containing false or omitted statements made knowingly and intentionally or with reckless disregard for the truth."  *United States v. Conant*, 799 F.3d 1195, 1199 (8th Cir. 2015).

The Hartmans allege that Bowles omitted material, exculpatory evidence from his affidavits and if he had included the evidence, a neutral and detached magistrate would not have objectively found probable cause for the warrant to issue.  Specifically, they assert Bowles omitted that the shooter was black and they are white, that the shooter wore a hoodie and baggy pants and they did not, that the shooter drove a blue Chrysler 200 and they drove a slate gray Infiniti, and that the time in the video evidence makes it objectively unreasonable that the Hartmans' vehicle could have been at the scene of the shooting.

Taking the Hartmans' allegations as true, it was not *entirely* unreasonable for Bowles to believe his warrant application established probable cause and to omit the evidence they argue should have been included.  Some of these allegedly material facts can easily be explained away.  For example, the Hartmans could have changed their clothes throughout the night, putting on or removing baggy pants and hoodies.  Thus, Bowles did not act unreasonably in excluding them from his warrant application.  The warrant application is not "so lacking in indicia of probable cause as to render official belief in its existence entirely unreasonable."  *Kiesling*, 859 F.3d at 533.  The Court dismisses Count I for failure to state a claim.

14

**B.      Count II – Initial Seizure without Probable Cause**

Bowles argues the Hartmans fail to state a claim in Count II, a Fourth Amendment claim for arrest without probable cause, because Bowles had arguable probable cause to arrest Ryan and James.

"The Fourth Amendment right to be free from unreasonable searches and seizures requires that arrests be based on probable cause." *Williams v. City of Alexander*, 772 F.3d 1307, 1310 (8th Cir. 2014). "Probable cause exists if 'the totality of facts based on reasonably trustworthy information would justify a prudent person in believing the individual arrested had committed . . . an offense.'" *Id.* (quoting *Flynn v. Brown*, 395 F.3d 842, 844 (8th Cir. 2005)). When the arrest is pursuant to a warrant, similar to searches pursuant to a warrant, "the fact that a neutral magistrate has issued a warrant is the clearest indication that the officers acted in an objectively reasonable manner." "But when a police officer deliberately or recklessly makes false statements to demonstrate probable cause for an arrest warrant, the warrant may be invalidated under *Franks v. Delaware*, 438 U.S. 154 [] (1978)." *Id.* at 1311.

In a case alleging omission of facts from an affidavit in support of an arrest warrant, the warrant may be invalid if "(1) [] the police omitted facts with the intent to make, or in reckless disregard of whether they thereby made, the affidavit misleading" and (2) adding the omitted information would negate the finding of probable cause. *United States v. Reivich*, 793 F.2d 957, 961 (8th Cir. 1986). Recklessness may be inferred from the fact of omission of information from an affidavit if the omitted material would have been clearly critical to the finding of probable cause." *Id.* "An officer may be liable for an unlawful arrest despite a magistrate's authorization where 'a reasonably well-trained officer . . . would have known that his affidavit failed to establish probable cause and that he should not have applied for the warrant.'" *Small v.*

*McCrystal*, 708 F.3d 997, 1006 (8th Cir. 2013) (quoting *Malley v. Briggs*, 475 U.S. 335, 344-45 & n.7 (1986)).

Bowles seeks to apply a different standard in his arguments.  He asserts that an officer is entitled to qualified immunity if there is at least arguable probable cause for the arrest.  This standard applies when an officer is making a warrantless arrest.  *See Borgman v. Kedley*, 646 F.3d 518, 522-23 (8th Cir. 2011) ("a *warrantless* arrest is consistent with the Fourth Amendment if it is supported by probable cause, and the officer is entitled to qualified immunity if there is at least arguable probable cause.") (emphasis added).  In *Dowell v. Lincoln County, Missouri*, the Eighth Circuit applies this standard in a situation where the arrest was made pursuant to a warrant.  762 F.3d 770, 777 (8th Cir. 2014).  However, in other cases the Court reviewed, where an officer made an arrest pursuant to a warrant, the Eighth Circuit made no mention of the arguable probable cause standard.  *See Williams*, 772 F.3d at 1310-11; *Small*, 708 F.3d at 1006. The cases cited to in *Dowell* involve warrantless arrests.  *McCabe v. Parker*, 608 F.3d 1068, 1072 (8th Cir. 2010); *Small*, 708 F.3d at 1003.[5]  Consequently, the Court applies the standard as outlined in *Williams*.

The Hartmans argue Bowles omitted the same material facts from his arrest warrant affidavits as he did from his search warrant affidavit with one addition.  They assert, for the arrest warrants, Bowles omitted the fact that ballistics testing showed that the gun seized in the search of Ryan's residence was not the gun used in the shooting.  Based on the Hartmans' own allegations, Bowles could not have included this evidence in his affidavit because he did not know it at the time.  The Amended Complaint alleges that during Ryan's arrest, a gun was found in his possession, and that ballistics evidence later demonstrated was not the gun used by the

_____

[5] *Small* involves several different arrests, some warrantless and some pursuant to arrest warrants.  The section of the opinion cited to here relates to the warrantless arrest at issue in the case.

shooter.  Doc. 10-1, ¶¶ 105, 106.  Bowles did not learn of the ballistics evidence until after he

arrested Ryan, which is necessarily after he applied for the arrest warrant.

Even if Bowles had included the omitted information in his arrest warrant affidavit, he

still had probable cause to believe the Hartmans shot the fire captain.  A witness described the

vehicle fleeing the area as a dark-colored sedan, possibly an Infiniti.  Video from the gas station

and credit card records show the Hartmans in the area of the shooting and driving a dark-colored

Infiniti.  Based on the allegations, a reasonably well-trained officer would not have known that

his affidavit failed to establish probable cause and that he should not have applied for an arrest

warrant.  *Small*, 708 F.3d at 1006.

### C.     Counts III & IV – Unreasonable Continued Seizure and Unfair Criminal Proceedings

Next, Bowles argues Counts III and IV of the Hartmans' Amended Complaint, the claims

for unreasonable continued seizure and unfair criminal proceedings, fail because there was

probable cause to arrest and restrain the Hartmans.  Bowles claims that the existence of probable

cause negates any § 1983 Fourth Amendment claim premised on an allegedly unreasonable pre-

trial restraint.

"Any deprivation of liberty before a criminal trial is governed by the Fourth Amendment

and its prohibition on unreasonable seizures."  *Johnson v. McCarver*, 942 F.3d 405, 410-11 (8th

Cir. 2019) (citing *Manuel v. City of Joliet*, 137 S. Ct. 911 (2017)).  "If the complaint is that a

form of legal process resulted in pretrial detention unsupported by probable cause, then the right

allegedly infringed lies in the Fourth Amendment."  *Manuel*, 137 S. Ct. at 919.  Prior to *Manuel*,

these types of claims were pursued in some cases as Fourth Amendment violations, and as

Fourteenth Amendment violations in others.  *See Russo v. City of Bridgeport*, 479 F.3d 196, 206-

09 (2d Cir. 2007) (discussing cases analyzing these claims under either the Fourth or Fourteenth Amendments).

Bowles suggests that because he had probable cause to arrest the Hartmans, his claims for unreasonable continued seizure and unfair criminal proceedings necessarily fail.  But as the Supreme Court has stated, "Obviously one . . . could not be detained indefinitely in the face of repeated protests of innocence even though the warrant under which he was arrested and detained met the standards of the Fourth Amendment."  *Baker v. McCollan*, 443 U.S. 137, 144 (1979).  Here, the Hartmans' Amended Complaint alleges in Count III that continued detention of the Hartmans is a constitutional violation because Bowles did not take any steps to end the prosecution or release the Hartmans despite his knowledge of exonerating information. Therefore, even if probable cause existed at the time of the Hartmans' arrests, Count III still states a claim for a violation of the Fourth Amendment.

To the extent Counts III and IV allege the initiation of the prosecution violates the Fourth Amendment, the Court dismisses those claims because as the Court stated above, Bowles had probable cause to initially arrest the Hartmans.  However, the remainder of the Counts as to the continued prosecution of the Hartmans remain because they sufficiently allege that Bowles knew of exonerating information when he learned that the gun used in this shooting was used in a different shooting while the Hartmans were on house arrest, but took no action to end the prosecution.

### D.     Qualified Immunity

Bowles asserts that he is entitled to qualified immunity for Counts I through IV.  Because the Court dismisses Counts I and II, it will only address this argument as to Counts III and IV. Qualified immunity shields law enforcement, and other government officials, from civil liability

unless "the official's conduct violates a clearly established constitutional or statutory right of which a reasonable person would have known." *Rogers v. King*, 885 F.3d 1118, 1121 (8th Cir. 2018) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982)).  The Court asks two questions to determine if qualified immunity applies: "(1) whether, after viewing the facts in the light most favorable to the party asserting the injury, there was a deprivation of a constitutional right," and "(2) whether the right was clearly established at the time of the deprivation such that a reasonable official would understand his conduct was unlawful in the situation he confronted." *Vaughn v. Greene Cty., Ark.*, 438 F.3d 845, 850 (8th Cir. 2006).  The Court may address either question first.  *Pearson v. Callahan*, 555 U.S. 223, 236 (2009).

The Court already determined above that at this stage in the litigation, the Hartmans' allegations sufficiently establish a deprivation of a constitutional right in portions of Counts III and IV.  The argument between the parties focuses on whether the constitutional right was clearly established at the time of the deprivation.  A reasonable officer would understand his conduct in failing to disclose exculpatory evidence and continuing to detain and prosecute individuals the officer knows is innocent is unlawful.

The continued deprivation of an individual's liberty without probable cause is clearly established.  *See Manuel*, 137 S. Ct. at 918-919.  The Supreme Court established this right long before the *Manuel* case.  *Id*. at 917-919 (discussing prior cases).  In *Manuel*, the Supreme Court simply clarified that any challenges to pretrial detention should be brought under the Fourth Amendment rather than the Fourteenth Amendment.  *Id*.  It is also clearly established that an individual also has a constitutional right to an adequate investigation.  *Winslow v. Smith*, 696 F.3d 716, 732 (8th Cir. 2012).  To be a constitutional violation, a failure to investigate must be intentional or reckless, shocking the conscience, and purposefully ignoring evidence suggesting

the defendant's innocence, as alleged here, qualifies.  *Id.*  Finally, since *Brady v. Maryland* in

1963, law enforcement and prosecutors have known they must disclose exculpatory evidence to

defendants.  373 U.S. 83, 87 (1963).  A reasonable official would understand that his decision to

ignore and not disclose to anyone exculpatory evidence and to continue with the prosecution of

the Hartmans' was unlawful.  *Vaughn*, 438 F.3d at 850.

      **E.**      **Count V – Malicious Prosecution**

      Bowles asserts that the Hartmans fail to state a claim for malicious prosecution under

Missouri law because the existence of probable cause negates any claim for malicious

prosecution.  To establish a malicious prosecution claim, a plaintiff must show the defendant,

with malice, instigated or continued an earlier lawsuit against the plaintiff without probable

cause for the filing of the lawsuit, the lawsuit ended in the plaintiff's favor, and damage to the

plaintiff resulted.  *State ex rel. O'Basuyi v. Vincent*, 434 S.W.3d 517, 519 (Mo. 2014); *King v.

Ryals*, 981 S.W.2d 151, 154 (Mo. Ct. App. 1998) ("Among the elements of a cause of action of

malicious prosecution is that the defendant initiated (or continued) the prosecution without

probable cause.").

      Under Missouri law, the test for determining whether probable cause existed asks

"whether the facts and circumstances would warrant a belief in an ordinarily cautious person that

another had committed a crime."  *Zike v. Advance Am., Cash Advance Ctrs. of Mo., Inc.*, 646

F.3d 504, 509 (8th Cir. 2011) (citation omitted).  "It is enough for the officer to show . . . 'merely

arguable probable cause,' which is a mistaken, but objectively reasonable belief, that the suspect

committed a criminal offense."  *Copeland v. Wicks*, 468 S.W.3d 886, 891 (Mo. 2015) (quoting

*Dowell v. Lincoln Cty., Mo.*, 762 F.3d 770, 777 (8th Cir. 2014)).  Here, the Court already

determined Bowles had at least arguable probable cause to arrest the Hartmans for shooting the

fire captain.  Thus, their claim for malicious prosecution fails as to the initiation of the prosecution.  *Joseph v. Allen*, No. 4:10CV1521 JAR, 2012 WL 1684565 at *5-6 (E.D. Mo. May 15, 2012) (citing *Kurtz v. City of Shrewsbury*, 245 F.3d 753, 757 (8th Cir. 2001)) ("[T]he existence of probable cause negates actions for . . . malicious prosecution in Missouri."). However, their claim as to Bowles's decision to continue the prosecution after learning the gun used in this shooting was used in a second shooting while the Hartmans were on house arrest, remains viable.  The Court grants the Motion and dismisses part of Count V for failure to state a claim for the Hartmans' claim that Bowles did not have probable cause to initiate their prosecution and denies the Motion as to the part of Count V that claims Bowles continued the prosecution of the Hartmans without probable cause.

Accordingly,

**IT IS HEREBY ORDERED** that Defendant Beary Bowles's Motion to Dismiss Plaintiffs' First Amended Complaint [13] is **GRANTED, in part,** and **DENIED, in part**.

So Ordered this 23rd day of June, 2020.

_____
**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**