**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MISSOURI**
**EASTERN DIVISION**

| | | |
|---|---|---|
| JAMES HARTMAN, et al., | ) | |
| | ) | |
| Plaintiff(s), | ) | |
| | ) | |
| vs. | ) | Case No.  4:19-cv-02963-SRC |
| | ) | |
| BEARY BOWLES | ) | |
| | ) | |
| Defendant(s). | ) | |

**<u>Memorandum and Order</u>**

This matter comes before the Court on [27] Plaintiffs' Motion for Reconsideration of [17] the Court's Order on Defendant's Motion to Dismiss.  The Court denies the motion.

**I.      Background**

The police charged Plaintiffs, brothers James and Ryan Hartman, with the early-morning shooting of a prominent fire-captain and his companion.  Defendant Beary Bowles, a detective, investigated the shooting, but as was later learned, exonerating evidence cleared the Hartmans. The prosecution eventually dropped the charges, and the Hartmans now seek redress from Bowles.

Plaintiff asserted five count against Bowles: (1) Fourth Amendment – unlawful searches of James's apartment and the Hartmans' parents' house; (2) Fourth Amendment – initial seizure of the person without even arguable probable cause; (3) Fourth Amendment – unreasonable continued seizure after obtaining forensic information about gun; (4) Fourth Amendment – unfair criminal proceedings; and (5) Missouri state law claim for malicious prosecution.  Defendant filed a motion to dismiss all counts against him.

The Court granted in part, and denied, in part, Bowles's motion to dismiss. The Court dismissed Counts I and II. The Court granted the motion to dismiss as to Counts III and IV to the extent those counts alleged the initiation of the prosecution violated the Fourth Amendment. However, the Court did not dismiss the remainder of Counts III and IV as to the continued prosecution of the Hartmans because they sufficiently alleged that Bowles knew of exonerating information and did not take action to end the prosecution. Lastly, the Court dismissed Count V as to the initial prosecution, but denied the motion as to the part of Count V that claims Bowles continued the prosecution of the Hartmans without probable cause.

Plaintiffs now move this Court to reconsider its Order in light of the Eighth Circuit's recent decision in *Bell v. Neukirch*, 979 F.3d 594 (8th Cir. 2020); *but see* Appellees' Petition for Rehearing En Banc, *Bell v. Neukirch*, No. 19-01713 (8th Cir. Nov. 12, 2020).

## II.     Standard

The Federal Rules of Civil Procedure do not mention motions for reconsideration. *See Elder-Keep v. Aksamit*, 460 F.3d 979, 984 (8th Cir. 2006). Thus, motions for reconsideration are typically construed by the Court as either a Federal Rule of Civil Procedure 59(e) motion to alter or amend the judgment or a Rule 60(b) motion for relief from judgment. *Ackerland v. United States*, 633 F.3d 698, 701 (8th Cir. 2011).

## III.    Discussion

Plaintiffs argue that *Bell* changes the law on probable cause. Specifically, Plaintiffs argue that *Bell* warrants reconsideration of the present case because the Eighth Circuit stated that "where a seized person's characteristics differ this substantially from what reasonably would be expected from the suspect, an officer does not have probable cause for an arrest." *Id*. at 604. The court then concluded that the officers in that case lacked probable cause because "the totality

2

of circumstances was insufficient to warrant a prudent officer in believing that Bell was the suspect who possessed the gun and fled the original scene." *Id*. Plaintiffs argue that the Hartmans' characteristics differed substantially from what reasonably could have been expected from the suspect who shot the fire captain and thus Bowles lacked probable cause to arrest them.

To determine whether *Bell* warrants a reconsideration of this Court's prior order, the Court must compare the "totality of circumstances" in *Bell* and the present case. The Court refers to its prior order for the well-plead factual allegations in the current case, Doc. 17, and summarizes the relevant portions of *Bell* below.

### A.    *Bell*

#### 1.    Relevant Facts

An individual called 911, reporting that a couple of black juvenile males with guns were pulling them out and playing with the weapons in the presence of four or five teenage girls outside a house. *Id.* at 599. The caller identified one "black juvenile male as having dreads, wearing a white t-shirt and jeans, and having a gun in his pocket." *Id.* The caller stated that the other black male juvenile had a black t-shirt on. *Id.*

"Missouri Police Officers Peter Neukirch and Jonathan Munyan responded to the call." *Id*. at 600. They arrived at the location and drove their vehicle towards three black juvenile males walking along the side of the street. *Id.* One of the three males began to run as the officers exited the vehicle and tossed his gun. *Id.* Officer Munyan gave chase but could not catch him. *Id.* He "then announced a description of the fleeing suspect over the police radio: 'Black male. Dreads. Blue Shorts.'" *Id.* Officer Munyan quickly elaborated the description over the police radio, stating "Juvenile black male, 17-18, about 5'10," skinny, blue shorts, white t-

shirt, shoulder length dreads.  He was taking his shoes off.  I'm not sure what kind of shoes he had." *Id.*

About a mile away and seven minutes after the suspect began to flee, Officer Chris Viesselman saw Bell talking on his cell phone while walking along the street. *Id.*  Bell "casually walked past Officer Viesselman's parked patrol car apparently unalarmed by his presence." *Id.* Officer Viesselman exited his car, called Bell over, and after asking for identification and frisking Bell, detained and handcuffed Bell. *Id.*

"Video footage from Officer Viesselman's dashcam and photographs of Bell show Bell wearing a white t-shirt, black shorts with a wide white stripe on each side, short black socks, and black Nike Air Jordan basketball shoes trimmed in red with a red logo on the tongue.  Bell apparently had short dreadlocks above the neck-line and had black hair with brown-colored tips." *Id*.  When asked over the radio about Bell's breathing and sweating, Officer Viesselman responded that Bell was "a little sweaty," but "breathing normal, though." *Id.* at 601.

Officer Munyan told Officer Viesselman he was reporting to the scene. *Id*.  While waiting for Officer Munyan to arrive, Officer Viesselman asked Bell how tall he was and Bell said 6'3." *Id*.  Officer Viesselman also added that Bell did not seem out of breath after a foot chase so he did not imagine Bell was the suspect. *Id*.  Officer Viesselman added that Bell matched the suspect's clothes and age. *Id*.

Officer Munyan reported to the scene and identified Bell as the suspect. *Id*.  He also stated that "he had 'noticed the red on Bell's shoes when he was running and started to take them off.'" *Id*.  The officers placed Bell in Officer Viesselman's patrol car. *Id*.

While Bell waited in Officer Viesselman's vehicle, Officer Munyan returned to the original scene to view the video footage of the initial encounter. *Id*.  He played back the video

4

twice.  *Id*.  Officer Neukirch told Bell to exit the vehicle and the officers then took photographs of Bell.  *Id*.  Officer Munyan then played back the video two more times.  *Id*.

Either Officer Munyan or Officer Neukirch provided information to Sergeant Luis Ortiz or Detective John Mattivi, who then approved placing Bell on a twenty-four-hour "investigative hold."  *Id*.  After taking Bell to the Juvenile Justice Center, Officer Neukirch played the video four more times.  *Id*.  Additionally, the other two juveniles present at the initial scene were at the Juvenile Justice Center, but the officers declined to ask them if Bell was the third suspect.  *Id*. at 601–602.  Similarly, the officers declined to ask the 911 caller to come in and identify Bell.  *Id*. at 602.  Bell presented evidence that both the other juveniles and the 911 caller would have informed the police that he was not the suspect.  *Id*.

After Bell had been detained for three weeks, Detective Mattavi watched the dash cam video footage for the first time. *Id*.  He observed that Bell was not the individual in the video. *Id*.  After he reviewed the footage with the prosecutor, the charges against Bell were dropped.  *Id*.

## 2.      Eighth Circuit's Analysis and Decision

Bell sued the officers, alleging, among other claims, that they violated his constitutional rights by arresting him without probable cause.  *Id*.  The Eighth Circuit explained that "[w]hether the officer had probable cause to arrest Bell depends on whether they had probable cause to believe that Bell was the same person who discarded a gun and fled from police at the original scene . . ."  *Id*. at 603.

In describing the probable cause standard, the court stated "probable cause may justify an officer's arrest of an otherwise innocent person when that person *reasonably* fits the description of the suspect.  But the mistakes must be those of reasonable men, acting on facts leading

sensibly to their conclusions of probability." *Id*. (citations and internal quotations omitted) (emphasis in original).

The court continued, explaining that while "[l]aw enforcement officers are afforded substantial latitude in interpreting and drawing inferences from factual circumstances . . . such latitude is not without limits." *Id*. (citations and internal quotations omitted). The Court provided two limits:

> First, because the *totality* of circumstances determines the existence of probable cause, . . . [a]n officer contemplating an arrest is not free to disregard plainly exculpatory evidence, even if substantial inculpatory evidence (standing by itself) suggests that probable cause exists. Under the Fourth Amendment, we must analyze the weight of all the evidence— not merely the sufficiency of the incriminating evidence—in determining whether [an officer] had probable cause to arrest [an individual]. Second, while officers need not conduct a "mini-trial" before making an arrest, they have a duty to conduct a reasonably thorough investigation prior to arresting a suspect, at least in the absence of exigent circumstances and so long as law enforcement would not be unduly hampered if the agents wait to obtain more facts before seeking to arrest.

*Id*. at 603–04 (internal citations and quotations omitted). Based on this standard, the court found "the totality of circumstances was insufficient to warrant a prudent officer in believing that Bell was the suspect who possessed the gun and fled the original scene." *Id*. at 604.

The court noted that Bell's appearance and that of the suspect's differed markedly in six important ways. Officer Munyan described the suspect as 5'10", but Bell is 6'3." *Id*. Bell's apprehension occurred a mile away from the scene and only seven minutes after the suspect had begun to flee. *Id*. He had just completed a call on his cell phone, breathing normally, and appeared a little sweaty, an unlikely condition if he had run a mile in seven minutes in 86 degree heat. *Id*. Third, Bell had "distinctly different apparel from the suspect." *Id*. Bell wore black shorts with large white stripes on the sides; the suspect wore solid dark blue or black shorts. *Id*. Bell wore short and black socks; the suspect wore gray socks that reached his calf. *Id*. Fourth, Bell's hair was in short dreadlocks with colored tips whereas the suspect's hair was all black and

bushy.  *Id*.  Fifth, the video "shows the suspect wearing low-cut shoes or sandals, while Bell wore black Nike Air Jordan basketball shoes trimmed in red and with a red logo on the tongue." *Id*.  "Lastly, Bell's relatively fresh appearance [was] noticeably inconsistent with what a reasonably prudent officer would expect to observe after running a mile in about seven minutes while changing shoes and clothing as Officer Viesselman observed."  *Id*.

The court stated that "where a seized person's characteristics differ this substantially from what reasonably would be expected from the suspect, an officer does not have probable cause for an arrest."  *Id*.   Based on the differences in characteristics laid out above, the officers could not reasonably believe they had probable cause to arrest Bell.  The court further stated that a reasonable officer watching the video footage from original scene would have noticed the differences in appearance between the suspect and Bell.  As stated by the court, "simply scanning a video does not make conduct objectively reasonable if an officer ignores or overlooks plainly exculpatory evidence. . . . An officer who repeatedly watched the video and failed to take note of the substantial discrepancies between Bell and the suspect demonstrates less diligence that [sic] what is expected of competent police officers about to limit someone's liberty by arrest."  *Id*. at 609 (internal citations omitted).

Lastly, the Court rejected the police officers' argument that it was reasonable to believe that Bell may have changed clothes and thus reasonable to believe there was probable cause. The court stated, "[i]t was not objectively reasonable to believe that Bell may have attempted to change his appearance by discarding solid dark shorts in favor of underlying black-and-white shorts, and by removing long gray socks to reveal short black socks, while retaining his single white t-shirt and walking along side of a road towards a parked patrol car during the supposed getaway."  *Id*.

## B.    Comparing *Bell* to Present Matter

Plaintiffs argue that like in *Bell*, their characteristics differ substantially from what could reasonably be expected from the suspect and thus Bowles did not have probable cause to believe the Hartmans shot the fire captain.  Specifically, they contend that the suspect who shot the fire captain was more likely than not black based on statements made by the fire captain.  Doc. 27-1 at 7-8.  Second, the fire captain stated that the shooter wore baggie clothes and a hoodie, but the Plaintiffs did not wear hoodies or baggy clothes on the night in question.  *Id*.  Third, Plaintiffs drove a gray Infiniti and the shooter drove a Navy Chrysler.  *Id*. at 8-9.  Lastly, video depicts James Hartman buying cigarettes in the gas station 140 seconds before the shooting and otherwise acting like a normal citizen.  *Id*. at 9-10.  Thus, Plaintiffs contend the totality of circumstances was insufficient to warrant a prudent officer in believing that the Hartmans shot the fire captain.  *Bell*, 979 F.3d at 604.

Plaintiffs overread *Bell*.  *Bell* serves as reinforcement and clarification that limits exist to believing that one has probable cause to arrest an individual.  Based on the specific facts of that case, a divided Eighth Circuit held the officers lacked probable cause because "the totality of circumstances was insufficient to warrant a prudent officer in believing that Bell was the suspect who possessed the gun and fled the original scene."  *Id*.  While a petition for en banc rehearing is pending, *Bell* presently holds that when there are clear differences between a suspect and an individual being detained, police officers cannot ignore those clear differences right in front of their eyes.

A comparison between the "totality of circumstances" in *Bell* and the case at hand reveals significant distinguishing facts.  First, no police eyewitness saw the suspect who shot the fire captain.  Second, no video footage clearly depicted the suspect.  Third, it is certainly more

plausible that Hartman may have put on a hoodie than Bell changed his shoes, shorts, and socks while running away from police and being found a mile away seven minutes later.  Fourth, no equivalent event exists in the present case to Bell casually walking down the street on his phone and not sweating, even though the suspect would have had to had run a mile in seven minutes in 86-degree heat to reach that location.

Bowles also had reason to believe that the Hartmans could be the suspects.  As the Court explained in its order, an eyewitness had described the vehicle fleeing the area as a dark-colored sedan, possibly an Infiniti and video from the gas station and credit card records showed the Hartmans in the area.  Doc. 17 at 17.  Additionally, Bowles could reasonably believe that the suspect was white based on what the fire captain told him at the hospital.

In sum, Bowles did not have the substantial available and obvious information demonstrating the readily-apparent distinguishing characteristics between the suspect and Bell that the officers in *Bell* had.  Unlike those officers, Bowles did not see the suspect, have clear video of the suspect showing him five inches taller, with different shoes, socks, and shorts, different hair color and style, watch a video depicting the suspect four times, and then still conclude he had the correct suspects.

Lastly, Plaintiffs argue that *Bell* renders the Court's "speculation" that Hartman may have changed clothes impermissible.  Doc. 27-1 at 8.  In *Bell*, the officers argued that because they had received training that "suspects shed items of clothing during foot pursuits to change appearance," *id*. at 605, "it was reasonable to think that Bell shed an outer layer of shorts and socks."  *Id*. at 609.  Consequently, the officers argued that they "could have believed there was probable cause on that assumption."  *Id*.

9

While the court acknowledged that fleeing suspects may change clothing, it found that without any evidence that officers had training or experience to expect a suspect to shed clothing in comparable circumstances, "the inference that Bell discarded an outer pair of solid-colored shorts and an outer pair of long gray socks is implausible." *Id*. at 606. The Court later stated that

> [w]ithout more, it was not objectively reasonable to believe that Bell may have attempted to change his appearance by discarding solid dark-colored shorts in favor of underlying black-and-white shorts, and by removing long gray socks to reveal short black socks, while retaining his single white t-shirt and walking along the side of a road towards a parked patrol car during the supposed getaway.

*Id*. at 609. Therefore, *Bell* found that if the officers' belief "was not objectively reasonable" based on the circumstances, the officers needed to provide evidence demonstrating the belief was reasonable due to the training they had received. *Id*. at 606, 609.

Thus, for *Bell* to control, the Court must find that "it was not objectively reasonable" to believe that Hartman may have put on a hoodie after entering his car at the gas station. *Id*. at 609. However, as stated above, it is certainly more plausible that Hartman may have put on a hoodie than Bell changed his shoes, shorts, and socks while running away from police and being found a mile away seven minutes later. Moreover, *Bell* even recognizes that suspects may shed an outer jacket to evade detection. *Id*. at 606. Thus, unlike the *Bell* court, the Court does not find that believing that Hartman may have put on a hoodie after entering his car at the gas station so "implausible" that Bowles could only establish he had probable cause by providing evidence that he had received training on that specific circumstance.

Therefore, the Court's finding that Bowles had probable cause remains appropriate under *Bell* because the "totality of circumstances" was sufficient "to warrant a prudent officer in

believing" that the Hartmans had shot the fire captain.  Accordingly, the Court denies [27]

Plaintiffs' Motion for Reconsideration.

So Ordered this 8th day of December 2020.

_____

**STEPHEN R. CLARK**
**UNITED STATES DISTRICT JUDGE**

11